**INTERNATIONAL FIDELITY INSURANCE COMPANY, a foreign corporation, and Allegheny Casualty Company, a foreign corporation, Plaintiffs,**

v.

**AMERICARIBE-MORIARTY JV, Defendant.**

**Case No. 15-24183-Civ-COOKE/TORRES**

United States District Court, S.D. Florida.

Signed June 22, 2016

Jeffrey Scott Geller, Edward Etcheverry, Etcheverry & Harrison LLP, Plantation, FL, Joyce Cruz Albert, Etcheverry Harrison LLP, Fort Lauderdale, FL, for Plaintiffs.

Richard Robert Chaves, Ciklin Lubitz & O'Connell, West Palm Beach, FL, for Defendant.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

MARCIA G. COOKE, United States District Judge

Plaintiffs International Fidelity Insurance Company and Allegheny Casualty Company (collectively "IFIC") bring this action for a declaratory judgment that Defendant Americaribe-Moriarty JV ("AMJV") failed to satisfy the conditions precedent to assert a claim against the performance bond issued by IFIC, and that AMJV materially breached the performance bond, rendering it null and void.

*See generally* Compl., ECF No. 1. In response, AMJV asserts a counterclaim against IFIC alleging that IFIC breached the performance bond by refusing to remedy the subcontractor's default or to arrange for the performance of the subcontractor's obligations under the subcontract. *See generally* Countercl., ECF No. 12.

AMJV filed a Motion for Summary Judgment with Integrated Memorandum of Law in Support (ECF No. 39), to which IFIC filed their Response in Opposition to Defendant's Motion for Summary Judgment (ECF No. 53), and AMJV filed its Reply to Plaintiff's Opposition Response Regarding Defendant's Motion for Summary Judgment (ECF No. 62). IFIC filed their own Motion for Final Summary Judgment and Supporting Memorandum of Law (ECF No. 51) and Statement of Undisputed Material Facts in Support of Final Motion for Summary Judgment (ECF No. 52), to which AMJV filed its Response in Opposition to Plaintiffs' Motion for Final Summary Judgment (ECF No. 63) and Statement of Material Facts in Opposition to Plaintiffs' Motion for Summary Judgment (ECF No. 61), and IFIC filed their Reply to Defendant's Response in Opposition to Plaintiffs' Motion for Final Summary Judgment (ECF No. 69).

I have reviewed both AMJV's and IFIC's Motions for Summary Judgment and accompanying attachments, the Responses and Replies thereto and accompanying attachments, the record, and the relevant legal authorities. I agree that AMJV materially breached the performance bond, rendering it null and void. As such, IFIC's Motion for Final Summary Judgment is granted and AMJV's Motion for Summary Judgment is denied.

## I. BACKGROUND

On February 26, 2014, AMJV, as general contractor, entered into a written subcontract agreement with Certified Pool Mechanics 1, Inc. ("CPM"), as subcontractor, to perform certain pool work at a project commonly known as Brickell City Centre Super Structure, located at 700 Brickell Avenue, Miami, Florida. Pls.' Statement Undisputed Material Facts ¶ 1, ECF No. 52. On April 1, 2014, IFIC issued a performance bond in connection with the subcontract on behalf of CPM, as principal, and AMJV, as obligee. *Id.* at ¶ 2.

On July 15, 2015, AMJV sent CPM a letter outlining various issues with CPM's work regarding the "East Block Pool Installation" and formally notified CPM of its default pursuant to Paragraph 11.2(a) of the subcontract. *See* ECF No. 52-4. AMJV further informed CPM that it had three working days to cure the default. *See id.* However, on August 17, 2015, AMJV sent a letter to both CPM and IFIC to advise IFIC of CPM's "serious project delay and poor performance" and to "request[ ] an immediate conference call with [IFIC] to substitute CPM's scope at the East Hotel pools with an alternative subcontractor[.]" *See* ECF No. 52-5. In response, in a letter to AMJV dated August 20, 2015, IFIC listed its availability for a conference call, informed AMJV of its attempts to "communicate with the appropriate representative of [its] principal to investigate the facts and circumstances concerning this matter," requested further information from AMJV, and warned AMJV "not to take any steps with respect to the completion of the project" without IFIC's prior consent. *See* ECF No. 52-6.

The parties, including CPM, conducted a telephone conference on September 2, 2015 to discuss CPM's performance under the subcontract. Pls.' Statement Undisputed Material Facts ¶ 8. Subsequently, IFIC mailed AMJV a letter dated September 15, 2015. In that letter, IFIC informed AMJV that they were in the process of reviewing the information provided by AMJV re-

garding CPM's default, but that the information provided was incomplete. *See* ECF No. 52-7. IFIC also noted that the completion date of the project had been "altered significantly from the baseline schedule" and that "the duration of [CPM's] activities [had] been significantly reduced," lending credence to CPM's argument that the schedule was impacted due to events beyond CPM's control. *Id.* As such, IFIC alerted AMJV that it needed "to better understand whether the impacts to the schedule [were] the result of CPM or the result of predecessor activities over which CPM [had] no control," requested a reply and further information from AMJV, and reminded AMJV that any attempt to complete the bonded work using another subcontractor would be a violation of the bond. *Id.* However, on September 16, 2015, AMJV obtained a proposal from a new potential subcontractor, Dillon Pools, Inc. ("Dillon Pools"), to complete the remaining scope of the subcontract. *See* ECF No. 52-9. Additionally, in an email exchange dated September 17, 2015, AMJV and Dillon Pools established a "presumed starting date" of September 21, 2015. *See* ECF No. 52-10.

In a letter dated September 21, 2015, which was addressed to both IFIC and CPM, AMJV officially declared CPM in default, terminated the subcontract, and made a demand upon IFIC to perform under the performance bond, pursuant to Sections 3.2 and 3.3 of the performance bond and Paragraph 12.2(a) of the subcontract. *See* ECF No. 52-8. Then, on September 22, 2015, AMJV sent IFIC a letter stating that it "intend[ed] to award the subcontract to complete the remaining work ... to Dillon Pools, Inc." ECF No. 52-11. In that same letter, AMJV asked that IFIC "provide all necessary lists of material, delivery dates and pricing to Dillon Pools as enquired in their effort to complete the Pool scope of work for the project." *Id.* As of September 23, 2015,

Dillon Pools "commenced performing supplementation work and on site investigations to determine corrective work required for the project ..." ECF No. 52-12.

In a letter dated September 29, 2015, IFIC acknowledged receipt of AMJV's letter declaring CPM in default, requested that AMJV provide them with the information they had previously requested in order to further their investigation, reminded AMJV not to take any steps with respect to completion of the project without IFIC's consent, and informed AMJV of their desire to conduct a site visit on October 1, 2015. *See* ECF No. 52-13. However, in a letter dated October 1, 2015, AMJV requested that IFIC "immediately arrange for a contract to be prepared for execution by [AMJV] and a contractor selected with [AMJV's] concurrence" as IFIC were "not licensed or qualified to perform and complete the Construction Contract (§ 5.2)" and AMJV "[would] not consent for CPM to perform and complete the Construction Contract (§ 5.1)." ECF No. 52-14 (emphasis omitted). AMJV also stated that its letter served as "AMJV's additional written notice to [IFIC] demanding that [IFIC] perform its obligations under [the] Bond within seven days." *Id.*

In a contract dated October 1, 2015 between AMJV, as contractor, and Dillon Pools, as subcontractor, Dillon Pools agreed "to furnish all labor, material, equipment, layout, etc., necessary for the complete performance of the Swimming Pools and Spa Work not completed by Certified Pool Mechanics 1, Inc. (CPM)." ECF No. 61-5 at 8. It was further understood as between AMJV and Dillon Pools that "[t]he subcontractor is taking over the scope of work from another Subcontractor terminated for cause." *Id.* AMJV and Dillon Pools anticipated a start date of September 28, 2015. *Id.* at 16. AMJV executed

the contract between itself and Dillon Pools on January 21, 2016. *Id.* at 29. Dillon Pools executed the contract on November 4, 2015. *Id.*

## II. LEGAL STANDARD

Summary judgment "shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir.1997) (quoting Fed. R. Civ. P. 56(c)) (internal quotations omitted); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir.1999). In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir.1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990).

■ "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. 2505. Likewise, a dispute about a material

fact is a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

■ "For factual issues to be considered genuine, they must have a real basis in the record . . . mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir.2005) (citations omitted). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. In those cases, there is no genuine issue of material fact "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548.

## III. DISCUSSION

■ In their Motion for Summary Judgment, IFIC argues, in part, that AMJV's unilateral completion of the subcontract, without first allowing IFIC to elect its performance option under the terms of the performance bond, materially breached the performance bond, rendering it null and void. In response, and in its own Motion for Summary Judgment, AMJV argues that it satisfied all conditions under the performance bond, that IFIC had a reasonable period of time to take action but

failed to do so, and that its actions in working to mitigate its damages by hiring a replacement subcontractor were expressly allowed under the terms of the subcontract.

Under Section 5 of the performance bond, once AMJV complied with Section 3 of the performance bond, in part by declaring CPM in default, terminating the subcontract with CPM, and notifying IFIC of the default, IFIC was obligated to "promptly" take one of the following actions:

§ 5.1 Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract.

§ 5.2 Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

§ 5.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay the Owner the amount of damages as described in Section 7 in excess of the Balance of the Contract price incurred by the Owner as a result of the Contractor Default; or

§ 5.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor, and with reasonable promptness under the circumstances:

1. After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or

2. Deny liability in whole or in part and notify the Owner, citing the reasons for denial.

ECF No. 52-3. If IFIC failed to proceed pursuant to Section 5 "with reasonable promptness," they would be deemed in default of the performance bond "seven days after receipt of an additional written notice from [AMJV] to [IFIC] demanding that [IFIC] perform its obligations under [the] Bond . . ." *Id.*

As such, IFIC argues that AMJV was required to afford IFIC an opportunity to act under Section 5 of the performance bond, but instead, AMJV unilaterally undertook corrective action by hiring Dillon Pools to complete CPM's allegedly defective work. More specifically, IFIC points to the fact that AMJV obtained a proposal from Dillon Pools on September 16, 2015 to complete the remaining scope of the subcontract, AMJV and Dillon Pools established a "presumed starting date" of September 21, 2015, and Dillon Pools did in fact commence work on September 23, 2015; all of which occurred within days of AMJV's official declaration of CPM's default on September 21, 2015.

However, AMJV contends that the performance bond also incorporates the subcontract, and thus was modified by Paragraphs 11.2(a) and 12.2(a) of its subcontract with CPM. Paragraph 11.2(a) of the subcontract, entitled "Subcontractor's Default," states, in pertinent part, that if CPM defaults, AMJV "shall be at liberty, if [CPM] fails to cure such default within three (3) working days following written notice mailed or delivered to [CPM], to provide any such labor or materials, and to deduct the cost thereof from any money due or thereafter to become due to [CPM]." ECF No. 52-2. Paragraph 12.2(a), entitled "Termination for Cause,"

states, in pertinent part, that if CPM "fails to cure the default after the three (3) day notice in Article 11.2(a)," AMJV "shall be at liberty to terminate [the Subcontract Agreement] upon an additional three (3) day written notice" and "take possession of all materials on site *and employ others to complete the Work." Id.* (emphasis added). Thus, according to AMJV, these provisions permitted it to complete CPM's work "once AMJV terminated CPM on 9/21/15." Def.'s Resp. 4, ECF No. 63.

In support of its argument that the incorporated subcontract modified the terms of the performance bond, thus allowing AMJV to complete the subcontract without breaching the performance bond, AMJV relies upon the reasoning in *Dooley & Mack Constructors, Inc. v. Developers Surety and Indem. Co.*, 972 So.2d 893 (Fla.Dist.Ct.App.2007). In *Dooley*, the subcontractor defaulted on its obligations, and, rather than notify the surety, the contractor remedied the default itself and then brought suit against the surety. *Dooley*, 972 So.2d at 894. The majority in *Dooley* interpreted the surety bond (which included by incorporation the subcontract between the contractor and subcontractor) to have two alternative routes by which the surety could face liability if the subcontractor defaulted on its obligations: (1) the bond itself stated that the contractor could notify the surety of the default and require that the surety remedy the default; or (2) the subcontract stated that the contractor could remedy the default itself and then later sue the surety to cover the shortfall. *Id.* at 895. While the contractor would have been required to give the surety notice if it had proceeded under the first route, no notice was required under the second route because the subcontract did not include any language explicitly requiring that notice be given. *Id.* Since the contractor proceeded under the second route in *Dooley*, the court held that it did

not have to give prior notice to the surety. As such, AMJV argues that its actions in contracting with Dillon Pools to complete CPM's subcontract were supported by the subcontract, whose terms were expressly incorporated into the performance bond. Additionally, AMJV argues that it did in fact comply with the notice requirements of the performance bond, and that its actions were justified by IFIC's unwillingness to act "promptly" per the express guidelines of Section 5 of the performance bond.

The Eleventh Circuit addressed *Dooley* in *CC–Aventura, Inc. v. Weitz Co., LLC*, and differentiated between those surety bonds and incorporated subcontracts that include language explicitly requiring notice to be given, and those surety bonds and incorporated subcontracts that do not (i.e. the surety bond and subcontract at issue in *Dooley*, which gave the general contractor "the option, but not the obligation, to notify the Subcontractor ..."). 492 Fed.Appx. 54 (11th Cir.2012) (citing *Dooley*, 972 So.2d at 895). The court ultimately found that while the bond and subcontract at issue in *CC–Aventura* had two routes by which the surety could be exposed to liability if the subcontractor defaulted, similar to the bond and subcontract in *Dooley*, both routes did include an explicit requirement that notice first be given to the surety, thereby differentiating the language in the bond and subcontract from the relevant documents in *Dooley*. *Id.* at 56.

More specifically, while the contractor in *Dooley* had "the option, but not the obligation, to notify," the subcontract in *CC–Aventura* "made reference to [the contractor's] ability to remedy the default, but only after [the contractor] terminated the subcontractor's performance for cause, and thus only after reasonable notice." *Id.* As such, the court, after "[r]eading all the language in the relevant documents ...

harmoniously in order to give effect to all provisions, as Florida law requires," found that the surety "had a right to reasonable notice before [the contractor] undertook to arrange for the performance of work to cure the default." *Id.* Reading all relevant documents together, the court held that the contractor was in fact required to first give notice to the surety before undertaking to remedy the default itself. *See id.* Since the contractor failed to provide such notice to the surety, the surety was relieved of its obligations under the bond per Florida law. *Id.* (citing *Dooley*, 972 So.2d at 894).

Turning to the facts at hand, the performance bond and subcontract at issue here also expose IFIC to liability in the event of a default by CPM via two routes: IFIC can undertake to remedy the default, or AMJV can undertake to remedy the default. However, the record here, similar to the record in *CC–Aventura*, reveals that both routes include an explicit notice requirement. Paragraph 12.2(a) of the subcontract explicitly states that the "Contractor shall be at liberty to terminate this Subcontract Agreement *upon an additional three (3) day written notice*," while Sections 3, 5, and 6 of the performance bond enumerate the procedures to be followed in the case of CPM's default, which include notice to IFIC, prompt action by IFIC, and AMJV's right to enforce any available remedy upon an additional seven days written notice to IFIC. In endeavoring to read all terms of the relevant contracts harmoniously, as Florida law requires, the procedures outlined in Sections 3, 5, and 6 of the performance bond and AMJV's rights under Paragraph 12.2(a) of the subcontract are not inconsistent; one does not modify or overrule the other.

While AMJV argues that it did in fact provide proper notice to IFIC of CPM's termination before entering into a contract with Dillon Pools, the record evidence suggests it was really notice in name only. AMJV notified CPM of its default, pursuant to Paragraph 11.2(a) of the subcontract, on July 15, 2015. Then, on September 21, 2015, AMJV declared CPM in default, terminated the subcontract, and made a demand upon IFIC to perform under the performance bond, pursuant to Sections 3.2 and 3.3 of the performance bond and Paragraph 12.2(a) of the subcontract. However, the very next day, on September 22, 2015, AMJV sent IFIC a letter stating that it intended to award the subcontract to complete the remaining pool and spa work to Dillon Pools. Dillon Pools then began work on the site on September 23, 2015. On October 1, 2015, AMJV formalized its relationship with Dillon Pools by officially entering into a contract with Dillon Pools to complete all pool and spa work not completed by CPM. Even viewing these facts in the light most favorable to AMJV, it cannot be argued that AMJV afforded IFIC actual notice and an opportunity to act before taking matters into its own hands and arranging for completion of the subcontract by Dillon Pools. In fact, AMJV anticipated employing Dillon Pools to complete the subcontract as early as September 16, 2015, when it obtained a bid from Dillon Pools. As such, any "notice" AMJV provided to IFIC was really notice in name only.

Similar to the surety in *CC–Aventura*, IFIC had a right to reasonable notice before AMJV undertook to arrange for performance of the pool and spa work to cure CPM's default. However, almost coextensive with its declaration of default, which triggered IFIC's options under Section 5 of the performance bond, AMJV engaged Dillon Pools and allowed Dillon Pools to begin work at the site. Any opportunity AMJV claims to have afforded IFIC to act under the performance bond is fictional, and AMJV cannot now brandish its "notice" as a sword to distinguish itself factu-

ally from the facts of *CC–Aventura.* The facts here are really no different from the facts of *CC–Aventura,* where the Eleventh Circuit agreed that the contractor failed to afford reasonable notice to the surety before undertaking to remedy the subcontractor's default. AMJV coordinated with Dillon Pools well before officially notifying IFIC of CPM's default and never really afforded IFIC the notice required per the terms of the performance bond and subcontract. As such, pursuant to Florida law, IFIC is relieved of its obligations to AMJV under the performance bond. *See N. Am. Specialty Ins. Co. v. Ames Corp.,* 2010 WL 1027866, at *8 (S.D.Fla. Mar. 18, 2010) (citing to *Dooley* in support of its holding that the contractor breached the performance bond, thereby discharging the surety's liability as a matter of law, by failing to afford the surety an opportunity to exercise its completion options under the performance bond).

 Additionally, even if I were to agree with AMJV that it did provide IFIC with notice as required under both the performance bond and subcontract, I still find that AMJV's actions in unilaterally hiring Dillon Pools to complete the scope of the subcontract breached the terms of the performance bond, thus precluding AMJV from seeking any relief under the performance bond. The text of Section 5 of the performance bond is unambiguous on this issue. After AMJV notified IFIC of CPM's default and made a claim under the performance bond, the performance bond outlined four ways for IFIC to proceed. The record evidence demonstrates that IFIC was actively considering its options under the terms of the performance bond and communicating with AMJV about its concerns when AMJV decided to unilaterally retain Dillon Pools to complete CPM's work. Although AMJV may have had a right under the subcontract to hire Dillon Pools to complete the subcontract, it did not have the right to do so without first

allowing IFIC an opportunity to exercise its rights under the performance bond. *See Fidelity & Deposit Co. of Maryland v. Jefferson Cty. Comm'n,* 2010 WL 5487397, at *5 (N.D.Ala. Nov. 17, 2010) (holding that the contractor was not entitled to any relief under the performance bond after it went outside the terms of the performance bond and hired its own contractor to complete the subcontract).

## IV. CONCLUSION

As such, having reviewed the arguments and the record, I find that Defendant AMJV failed to provide reasonable notice to IFIC before undertaking to remedy CPM's default. Additionally, I find that AMJV's actions in unilaterally retaining Dillon Pools to complete the subcontract precluded IFIC from exercising its performance options under the terms of the performance bond. Therefore, AMJV materially breached the performance bond and is not entitled to any relief under the performance bond. Accordingly, summary judgment in favor of IFIC is appropriate.

It is, therefore, **ORDERED and ADJUDGED** as follows:

1. Plaintiffs' Motion for Final Summary Judgment (ECF No. 51) is **GRANTED.**

2. Defendant's Motion for Summary Judgment (ECF No. 39) is **DENIED.**

3. All pending motions, if any, are **DENIED** *as moot.*

4. The Clerk shall **CLOSE** this case.

5. A separate judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure shall issue concurrently.

**DONE and ORDERED** in Chambers, at Miami, Florida, this 22nd day of June 2016.